# UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

No. 25-1097

ANASH, INC. d/b/a Wyoming Valley Yeshiva;
RABBI SHIMON HELLINGER, individually and in
his capacity as an authorized representative of
Wyoming Valley Yeshiva and relevant
community members,
Appellants

v.

BOROUGH OF KINGSTON a/k/a Municipality of
Kingston; DAVID R. YEFKO, individually and in
his capacity as Zoning Officer for the
Municipality of Kingston; ROBERT SUCHOSKI,
individually and in his capacity as Code
Enforcement Officer for the Municipality of
Kingston

———————————————

On Appeal from the U.S. District Court, M.D. Pa.
Judge Karoline Mehalchick, No. 3:24-cv-01955

Before: RESTREPO, PHIPPS, and MASCOTT, *Circuit Judges*
Argued: Jan. 22, 2026; Filed: July 30, 2026

———————————————

OPINION OF THE COURT

PHIPPS, *Circuit Judge*.

After receiving complaints, a municipality investigated two buildings located in a commercially zoned district for violations of the municipality's building code and its zoning ordinance. Both buildings were owned by a Jewish rabbi. One

was used as a residence for boys and young men who were studying and practicing their faith under the rabbi's tutelage. The other contained his office as well as rooms for prayer, religious study, and religious instruction. The municipality issued two notices of zoning-ordinance violations for each property on the grounds that those uses were not permitted in commercial districts. Then, on the day before Rosh Hashanah, it obtained administrative search warrants, inspected the properties, and immediately condemned them. The municipality then refused to allow occupancy until the buildings were compliant with both the building code and the zoning ordinance. And although it recognized that there was no quick or easy way to bring at least one of the buildings into compliance with the zoning ordinance, the municipality threatened fines of $500 for each day of non-compliance.

The rabbi and his congregation sued the municipality along with its zoning and code enforcement officers on several grounds in the District Court. Among their grievances were multiple claims under RLUIPA, the Religious Land Use and Institutionalized Persons Act of 2000, Pub. L. No. 106–274, 114 Stat. 803 (codified at 42 U.S.C. §§ 2000cc–2000cc-5). Relying primarily on the RLUIPA claims, the rabbi and his congregation moved for a preliminary injunction to allow them to access and use the properties and to be free from enforcement actions during the pendency of their suit. The District Court denied that motion.

The rabbi and his congregation then initiated this interlocutory appeal to challenge that order. For the reasons below, we will REVERSE its order denying preliminary injunctive relief and REMAND for further proceedings consistent with this Opinion.

## FACTUAL BACKGROUND

### A. Kingston's Zoning Laws Before 2023

The Municipality of Kingston is located in Luzerne County, Pennsylvania, on the northwestern bank of the Susquehanna River across from Wilkes-Barre.[1] It has a land area of 2.15 square miles or 1376 acres. One of the principal arterial roadways in Kingston is Pierce Street, which is approximately one mile long and runs from its intersection with U.S. Route 11 (Wyoming Avenue) to its transition into the Veterans Memorial Bridge, which crosses the Susquehanna.

Under the zoning ordinance adopted by Kingston's Town Council on July 11, 1977, some of the parcels abutting Pierce Street were zoned as C-2 Districts. Those districts, also referred to as 'Community Commercial' Districts, permitted major retail establishments. Kingston, Pa., Mun. Code § 181-9 (1977). In addition, under the 1977 Zoning Ordinance, all uses permitted in C-1 Districts, referred to as 'Neighborhood Commercial' Districts, were permitted in C-2 Districts. *Id.* Thus, because business and professional offices were authorized in C-1 Districts, they were allowed in C-2 Districts. Also permitted in C-1 Districts, and by extension in C-2 Districts, were 'public uses,' such as public schools, *id.* § 181-8, as well as 'semi-public uses,' defined as "[c]hurches, Sunday schools, parochial schools, colleges, hospitals and other institutions of an educational, religious, charitable or

---

[1] Before it enacted a home rule charter that went into effect in January 1976, *see In re Petition to Recall Reese*, 665 A.2d 1162, 1163 (Pa. 1995), Kingston was a borough, but with the home rule charter, it became a municipality. *See generally* 1 Pa. Cons. Stat. § 1991 (defining 'municipality' as encompassing but not being coextensive with a 'borough'); 8 Pa. Cons. Stat. § 101.1 (same). Despite that formal designation, Kingston still refers to itself as a borough. *See, e.g.*, The Borough of Kingston Home Page, https://kingstonpa.org/ (last visited May 8, 2026).

3

philanthropic nature," *id.* C-2 Districts were similarly inclusive of uses permitted in residential districts: any use authorized in a residential district was also allowed in a C-2 District. *See id.* § 181-12(B)–(C). And because single-family dwellings were permitted in residential districts, they were allowed in C-2 Districts. *Id.* § 181-8 (defining a 'single-family dwelling' as "[a] detached building designated for or occupied exclusively by one family and containing not more than one dwelling unit").

### B. Rabbi Hellinger Founds the Wyoming Valley Yeshiva in Kingston

An Orthodox Jewish rabbi, Shimon Hellinger, acquired property in Kingston for his congregation, the Wyoming Valley Yeshiva, which was formally incorporated as Anash, Inc. In 2019, he purchased for $45,000 a property at 239 Pierce Street in a C-2 District that included a house and 0.07 acres of land. He received a certificate of occupancy from Kingston for the property as a single-family dwelling. That certificate indicated that single-family use was a conforming use within a C-2 District and cautioned that "[a]ny changes in the use and occupancy as designated above without approval of the Zoning Administrator will automatically render this certificate null and void." Certificate of Occupancy (JA218). Rabbi Hellinger used the house for religious group living for about ten Orthodox Jewish young men who were his students and members of his congregation and who used the property for religious purposes such as group prayer. The residents did not have to pay monthly rent, but some offered donations to offset costs.

In 2021, Rabbi Hellinger purchased another property about a tenth of a mile away, also in a C-2 District, for $134,000. That 0.16-acre parcel, located at 44 Pierce Street, included a two-story building with a small parking area in back. The certificate of occupancy described its use as an "office space" and also included the same admonition about changes in use rendering the certificate null and void. Zoning Occupancy

4

Certificate (JA217). After acquiring this property, Rabbi Hellinger used it for his rabbinical office, and also as a yeshiva – a space devoted to prayer, religious study, and religious instruction.

### C. The Repeal and Replacement of the 1977 Zoning Ordinance

In 2023, Kingston hired consultants to design a new comprehensive zoning ordinance. As explained by the chief consultant, the 1977 Zoning Ordinance was "substandard and not up to what the best practices are," Kingston Pub. Hr'g Tr. 20:23–24 (Mar. 6, 2023), so he proposed a "rewrite of [the] entire [o]rdinance," *id.* at 18:11–12.

Once prepared, the draft of the new ordinance, referred to herein as the '2023 Zoning Ordinance,' was subject to a public comment period. During that review, the 2023 Zoning Ordinance was discussed at a Town Council meeting on March 6, 2023.

Kingston's Zoning Officer spoke at that public meeting to address "the key zoning map changes." *Id.* at 14:3–4. He identified some of the revisions that were designed to "ensure that the entire property of each of the[] lots" abutting Pierce Street were zoned commercial. *Id.* at 14:17–18.

The consultant who drafted the 2023 Zoning Ordinance also spoke at the meeting. He explained that the 2023 Zoning Ordinance created three classes of permitted use: "by right, special exception or conditional use." *Id.* at 21:20. A use permitted by right in a zoning district would not require any further approval. A use permitted by special exception would require approval from the Kingston Zoning Hearing Board. And because conditional use was reserved for "such importance, a one-of-a-kind type of use," it would be permitted in a zoning district only upon approval by the Kingston Town Council. *Id.* at 22:15–16.

5

That framework differed from the prior zoning ordinance's use of an inclusive approach in which every use permitted in C-1 Districts or in residential districts would be permitted by right in C-2 Districts. Consistent with its new method, the 2023 Zoning Ordinance included a table that indicated, for each zone, whether a use would be permitted by right, by special exception, as a conditional use, or not permitted at all.

Also, compared to its predecessor, the 2023 Zoning Ordinance included a greater number of specifically defined land uses. For instance, it provided that, in general, the term 'rooming and/or boarding house' meant "[a] residential structure or portion thereof which contains rooms which are rented or leased, with the occupants of said units being non-transient, and utilizing said location as a legal place of residence." Municipality of Kingston, Pa., Zoning Ordinance § 203 (2023). That general definition was subject to specific inclusions and exclusions, and one of the specific exclusions stated that rooming houses did not include dormitories. *See id.* Other than that reference to dormitories, however, the proposed zoning ordinance did not mention, much less define, the term 'dormitory.'[2] The 2023 Zoning Ordinance also defined the term 'school' as dependent on state licensure: "[a] facility that provides a curriculum of elementary and secondary academic instruction, including kindergartens, elementary schools, junior high schools, and high schools that *are licensed by the State* and including schools which provide trade or vocational training." *Id.* (emphasis added).

On May 1, 2023, Kingston approved the 2023 Zoning Ordinance. Its combination of a new zoning scheme and revised definitions had a transformative impact on permitted uses in C-2 Districts. Single-family dwellings (redefined as

---

[2] At the time, other zoning codes besides Kingston's had made references to the term 'dormitory,' and it had also been defined in other building codes. *E.g.*, 2021 International Zoning Code § 202; 2021 International Building Code § 202.

'one-family dwelling units') and rooming houses were non-permitted uses in C-2 Districts. Similarly, although both public schools and parochial schools were previously permitted in C-2 Districts (as public uses and semi-public uses, respectively), 'schools,' as defined by the 2023 Zoning Ordinance, were not permitted in C-2 Districts as of right but rather were allowed only as conditional uses.

The degree of disruption from those and other changes was reduced because the 2023 Zoning Ordinance included grandfathering clauses. Under those provisions, uses of property, referred to as 'nonconforming uses' that were "lawfully in existence prior to the enactment of such ordinance," could be continued through a Certificate of Nonconformance issued by the Zoning Officer. *Id.* The 2023 Zoning Ordinance generally limited the nonconforming-use approval to a prior nonconforming use – such a prior use could not justify a new, different nonconforming use on the same property. *Id.* §§ 904, 907. But if a property subject to a nonconforming-use exception was condemned, it had to be restored "in conformity with uses permitted within the Zoning District in which such structure is located." *Id.* § 910.4.

### D. Enforcement of the 2023 Zoning Ordinance with Respect to the Pierce Street Properties

A few months after the 2023 Zoning Ordinance took effect, a neighbor repeatedly complained to a member of the Town Council that the 239 Pierce Street property was being used as a dormitory and had "unsupervised young men living there." Prelim. Inj. Hr'g Tr. 108:15 (JA152). Kingston's Municipal Solicitor thought "it was important to take care of this problem for Kingston." *Id.* at 108:17–18 (JA152).

Kingston then began to address those issues. In September, Kingston's Code Enforcement Officer wrote to Rabbi Hellinger with a request to discuss "several complaints and concerns" that the 239 Pierce Street property was in violation of Kingston's Municipal Code and its Fire Code, collectively

7

referred to herein as the 'Building Code.' Letter from Robert Suchoski, Code Enforcement Officer, Municipality of Kingston, to Rabbi Hellinger (Sep. 13, 2023) (SA41); *cf.* Kingston, Pa., Mun. Code §§ 60, 94, 116, 135. And in an October 4 letter to Rabbi Hellinger's attorney, the Municipal Solicitor opined that the use of the 239 Pierce Street property "as a dormitory is entirely illegal." Letter from Harry P. Mattern, Municipal Solicitor, Municipality of Kingston, to David Schwager, Attorney for Rabbi Hellinger (Oct. 4, 2023) (JA208). He further communicated that he did not "see any way under the [2023 Zoning Ordinance] to quickly or easily expand the use beyond that which has previously existed as a single family residence." *Id.* (JA209).

Rabbi Hellinger met with the Code Enforcement Officer and the Municipal Solicitor later in October. During that meeting, he described the religious practices of his congregation, and he explained how he was using the property. He perceived, however, that "there was no interest on their part to try to work something out. They were just trying to get us to stop and shut down." Prelim. Inj. Hr'g Tr. 38:15–17 (JA82).

In correspondence dated March 19, 2024, the Municipal Solicitor asked for a second meeting. The stated purpose of that meeting was Building Code compliance, including a request for inspection. Rabbi Hellinger and his attorney met with the Municipal Solicitor, but Rabbi Hellinger was not willing to permit Kingston to inspect the 239 Pierce Street property.

On April 4, 2023, Kingston's Zoning Officer issued a Notice of Violation to Rabbi Hellinger for 239 Pierce Street. It stated that the property was being used impermissibly as a "rooming/boarding house," which was not a permitted use in a C-2 District under the 2023 Zoning Ordinance, and it ordered him "to cease and desist the illegal use." Notice of Violation – 239 Pierce St. (JA204). The notice also stated that "[t]here will not be any follow-up requests regarding this situation," and

8

that failure to comply within five business days would result in the issuance of a citation. *Id.* (JA205).

That notice also outlined a process for Rabbi Hellinger to bring his use of 239 Pierce Street into compliance with the 2023 Zoning Ordinance through the grandfathering provisions. According to the Zoning Officer, Rabbi Hellinger would have to apply to change 239 Pierce Street from "one nonconforming use to another nonconforming use." *Id.* (JA204). The Zoning Officer forecasted that he would deny that application upon receiving it, but then Rabbi Hellinger could apply for a Special Exception from the Kingston Zoning Hearing Board. *Id.* (JA204).

The next week, Kingston turned its attention to 44 Pierce Street. On April 11, 2023, it issued a Notice of Violation for that property, which declared that the property was being used impermissibly as a 'school.' Because that was not an approved conditional use in a C-2 District, it ordered Rabbi Hellinger to cease and desist that use. As with the notice for 239 Pierce Street, this notice outlined a process under the grandfathering provisions for Rabbi Hellinger to bring his use of 44 Pierce Street into zoning compliance.

After receiving those notices, Rabbi Hellinger did not follow the processes proposed by the Zoning Officer, and he continued to use the properties as he had been.

On August 22, 2024, Kingston issued Second Notices of Violation for each property. Those notices declared that the properties were being used illegally and, after recounting that Rabbi Hellinger had refused to allow inspection of the properties for Building Code violations, ordered that he immediately cease and desist occupancy of them. The notice for 239 Pierce Street changed the basis for the zoning infraction; instead of claiming that the property was being improperly used as a rooming/boarding house, it announced that the property was being illegally used as a 'dormitory' – a

9

term not defined in the 2023 Zoning Ordinance. The notice for 44 Pierce Street relied on the same ground as before, the assertion that the property was being used as a school.

Both notices emphasized that "[t]he Municipality of Kingston reserves the right to pursue any and all legal options afforded to them until you comply with this order." 2d Notice of Violation – 239 Pierce St. (JA206); 2d Notice of Violation – 44 Pierce St. (SA82). Both notices further indicated that "[c]itations have already been filed with the district Magistrate's Office." 2d Notice of Violation – 239 Pierce St. (JA206); 2d Notice of Violation – 44 Pierce St. (SA82). The citation amount was $500, the maximum permitted, and each notice indicated that Kingston would be issuing new citations "on a daily basis" as long as the properties remained out of compliance with the 2023 Zoning Ordinance. 2d Notice of Violation – 239 Pierce St. (JA206); 2d Notice of Violation – 44 Pierce St. (SA82).

Rabbi Hellinger contacted the Magistrate's Office and learned that "there was no citation filed," and thus "no opportunity . . . to appeal." Prelim. Inj. Hr'g Tr. 25:4, 8–9 (JA69). He continued to use both properties as he had been.

### E. The Issuance of Administrative Search Warrants and the Condemnation of the Pierce Street Properties

On October 1, 2024, the day before Rosh Hashanah, which commences the High Holy Days, Kingston applied for four administrative warrants to search the Pierce Street properties – two for Building Code violations and two for non-compliance with the 2023 Zoning Ordinance.

Kingston's Code Enforcement Officer submitted applications for warrants to search both properties based on identified Building Code violations. Also, for 44 Pierce Street, the identified violations included the allegation that a mikvah – a pool of water used for immersion as part of a purification

ritual – had been "installed in the basement without any building permit being acquired." Code Appl. for Administrative Search Warrant of 44 Pierce St. (D.C. ECF No. 1-13).

Kingston's Zoning Officer submitted the zoning-based warrant applications for both properties. For 239 Pierce Street, he averred that the search was justified because the property was being maintained as "a dormitory or boarding house in a single-family residence in a C-2 [Z]one" and because Rabbi Hellinger did not "allow inspection for safety or Code [c]ompliance."[3] Zoning Appl. for Administrative Search Warrant of 239 Pierce St. (D.C. ECF No. 1-10). His application for a warrant to search 44 Pierce Street claimed a zoning violation of "[m]aintaining a school in a C-2 Zone," and cited Rabbi Hellinger's "[f]ailure to allow inspection for safety or Code [c]ompliance." Zoning Appl. for Administrative Search Warrant of 44 Pierce St. (D.C. ECF No. 1-14).[4]

---

[3] Kingston's Zoning Officer also averred under penalty of perjury, *see* 18 Pa. Cons. Stat. § 4904, that Kingston "has received numerous complaints of many young children residing in the property. *No adult supervision is observed*." Zoning Appl. for Administrative Search Warrant of 239 Pierce St. (D.C. ECF No. 1-10) (emphasis added). Later, however, in the course of this litigation, Kingston produced some of the information it acquired as part of its investigation into the uses of the 239 Pierce Street property, and those materials included a surveillance photo with a date stamp of April 5, 2024, of a man wearing a hat walking with two children. And, as explained below, when the property was searched, there were two adults on site at the time.

[4] All four warrant applications also indicated that Rabbi Hellinger had failed to register as a landlord as separately required by the Municipal Code. *See* Kingston, Pa., Mun. Code § 116-4(A) (2014). That Code provision applies to properties occupied by a 'tenant,' defined as "[a]n individual

11

A magisterial district judge authorized all four search warrants at 9:00 a.m. that day. The Code Enforcement Officer and the Zoning Officer, accompanied by local police and other Kingston officials, then began to execute the warrants. They first went to 239 Pierce Steet, and upon their arrival, they called Rabbi Hellinger to inform him that they would break down the door unless he let them inside. Rabbi Hellinger provided the access code to that building, and they began the search. They encountered two adults, whom the police did not allow to leave the property without providing identification. They also found unattended hot plates, trash bags in inappropriate locations, and an exposed but capped electrical wire extending from a hole in the ceiling in one room.

Rabbi Hellinger also granted access to 44 Pierce Street. The search of that property found uncovered and exposed holes in the floor of the basement from the construction of the mikvah.

After completing the searches, Kingston condemned the Pierce Street properties through no-occupancy orders posted on the front doors of both properties. In large type, both orders declared the properties "unsafe for human occupancy or use," and both had illegible signatures above the Code Enforcement Officer's title. No-Occupancy Orders (D.C. ECF Nos. 1-11, 1-15). The notice for 239 Pierce Street did not identify the ordinance or the section of the ordinance that served as the basis for the condemnation, but it did include the handwritten

---

who resides in a residential rental unit, with whom a legal relationship with the owner/landlord is established by a lease or by the laws of the Commonwealth of Pennsylvania." *Id.* § 116-3. The residents of 239 Pierce Street did not, however, have leases and did not pay rent, and there has been no alleged other source for such an owner/landlord relationship under the other laws of the Commonwealth of Pennsylvania. Nor was there any mention of tenants at the 44 Pierce Street property, which was allegedly being used as a school.

12

description, "No Sprinklers, No Fire Extinguishers, No Egress Signage, No Emergency Lights." No-Occupancy Order – 239 Pierce St. (D.C. ECF No. 1-11). The notice for 44 Pierce Street likewise did not provide the ordinance and section that permitted the condemnation, but it did include the handwritten annotations, "No Fire Extinguishers, No Emergency Lighting, No Egress Signage, Open Electrical Issues, Not Allowed [Illegible] for Usage." No Occupancy Order – 44 Pierce St. (D.C. ECF No. 1-15). Both orders declared it unlawful to enter or occupy the buildings after 6:00 p.m. on October 1, 2024.

Rabbi Hellinger, his students, and his congregants complied with those orders. The condemnation of the Pierce Street properties disrupted the congregation's religious observance of Rosh Hashanah and the High Holy Days.

Rabbi Hellinger's attorney contacted the Municipal Solicitor for Kingston to request the reopening of the Pierce Street properties. In a letter dated November 4, 2024, the Solicitor responded that, after discussions with the Zoning Officer, for the Pierce Street properties to be reopened, "it will be necessary for Rabbi Hellinger to comply with the [2023] Zoning Ordinance." Letter from Harry P. Mattern, Municipal Solicitor, Municipality of Kingston, to Alexander M. Brunelle, Attorney for Rabbi Hellinger (Nov. 4, 2024) (JA207).

The condemnation orders have remained in effect since their issuance. Rabbi Hellinger has not been able to "hold regular services," Prelim. Inj. Hr'g Tr. 36:24 (JA80), or "lead the congregation in a group manner," *id.* at 39:5 (JA83). Some congregants have left town. *See id.* at 39:5–6 (JA83). Others "go [to religious services] elsewhere or they don't go at all." *Id.* at 40:15–16 (JA84). And while there are still those who are "not quick to give up [their] religion because [they're] not able to practice, . . . most of the congregation is not engaging." *Id.* at 39:20–22 (JA83).

13

## PROCEDURAL HISTORY

On November 13, 2024, Rabbi Hellinger and Anash initiated this suit in the District Court against Kingston, its Zoning Officer, and its Code Enforcement Officer, collectively referred to herein as 'the Kingston Defendants.'

Thirteen of the claims in their 21-count complaint were based on federal law. Four of those counts were brought under RLUIPA, specifically for violations of its substantial-burden provision, its equal-terms provision, its nondiscrimination provision, and its exclusions-and-limits provision. *See* 42 U.S.C. § 2000cc(a)(1), (b)(1)–(3). The other federal claims included allegations of a procedural-due-process violation,[5] and the complaint also contained eight counts based on Pennsylvania law.[6]

On December 2, 2024, Rabbi Hellinger and Anash moved for a temporary restraining order and a preliminary injunction based on their RLUIPA and procedural-due-process claims. They sought to enjoin the Kingston Defendants in three ways: (i) from enforcing the condemnation orders for the Pierce Street properties; (ii) from taking adverse zoning or other enforcement actions against the Pierce Street properties

---

[5] The remaining federal claims consisted of one other statutory claim under the Fair Housing Act, *see* 42 U.S.C. § 3604(a), and several claims based on alleged violations of constitutional rights (free exercise, free speech, free association, equal protection, substantive due process, unreasonable search and seizure, and civil conspiracy to interfere with those rights).

[6] Those counts alleged violations of the Pennsylvania Constitution, *see* Pa. Const. art. 1, §§ 3, 7, 20, 26, the Pennsylvania Human Relations Act, *see* 43 Pa. Stat. § 953, and the Pennsylvania Religious Freedom Protection Act, *see* 42 Pa. Cons. Stat. § 7103, as well as for the torts of abuse of process, tortious interference, defamation, public disclosure of private facts, and negligent training and supervision.

without constitutionally adequate process; and (iii) from discriminating against them based on their religious practices.

In exercising federal-question jurisdiction over those claims, *see* 28 U.S.C. § 1331, the District Court denied the requested temporary restraining order and scheduled an evidentiary hearing on the preliminary injunction. At that hearing, Rabbi Hellinger and another rabbi testified in favor of the requested injunctive relief, and the Municipal Solicitor for Kingston testified on behalf of the Kingston Defendants.

On December 19, 2024, the District Court denied the motion for preliminary relief. The accompanying memorandum opinion explained that Rabbi Hellinger and Anash had failed to establish either a likelihood of success on their claims or an irreparable harm. *Anash, Inc. v. Borough of Kingston*, 2024 WL 5294369, at *3 (M.D. Pa. Dec. 19, 2024). In reaching those conclusions, the District Court emphasized that Rabbi Hellinger and Anash "have alternative locations, albeit imperfect ones, at which they can host religious and educational activities." *Id.* at *5. In addition, the District Court concluded that the balance of the hardships favored the Kingston Defendants based on their interests in avoiding a dilution in the effectiveness of the 2023 Zoning Ordinance through "a loophole [that] would surely result in great harm to local governments attempting to effectuate and promote safety and health interests." *Id.* at *11. The District Court also determined that the public interest in safety favored the Kingston Defendants based on four unsafe conditions associated with the Pierce Street properties: (i) "exposed electrical wires"; (ii) "trash and hot plates that are left out in unfit locations, accessible to children without any clear adult supervision"; (iii) the "construction of a Mikvah . . . [in a] basement that opens into a large hole in the ground, without stairs, [which] could certainly be considered a danger to the children and younger adults living there"; and (iv) "unsupervised children and potential fire and safety hazards." *Id.* at *10–11.

15

Through a notice of appeal, Rabbi Hellinger and Anash invoked this Court's interlocutory appellate jurisdiction over denials of motions for preliminary injunctive relief. *See* 28 U.S.C. § 1292(a)(1). In challenging the District Court's order, they rely on three of their RLUIPA claims – those under the substantial-burden, the equal-terms, and the exclusions-and-limits provisions – as well as their procedural-due-process claim.

In February 2026, after oral argument in this case, the United States Department of Justice commenced a civil enforcement action against Kingston based on allegations that the 2023 Zoning Ordinance violates RLUIPA's equal-terms and exclusions-and-limits provisions, *see* 42 U.S.C. § 2000cc(b)(1), (3); *see also id.* § 2000cc-2(f) ("The United States may bring an action for injunctive or declaratory relief to enforce compliance with [RLUIPA].") Kingston was on notice of the Department of Justice's investigation since June 2025, and it cooperated with the investigation. The same day as the suit was filed, the Department of Justice and Kingston submitted a consent motion to enter a presumptive four-year consent decree, which the District Court approved two days later. That decree enjoined Kingston in several ways and provided Kingston 120 days to amend the 2023 Zoning Ordinance in at least seven respects. Kingston's Town Council voted to adopt amendments to the 2023 Zoning Ordinance at a meeting on July 7, 2026. The amendments were published, and they have an expected effective date 30 days after publication, which projects to be on or about August 15, 2026. Even so, the Court has not received notice from either party that the Kingston Defendants have restored access to the Pierce Street properties.

## DISCUSSION

A preliminary injunction preserves for the duration of a case the *status quo ante* – the way things used to be before the

16

complained-of acts.[7] Such preliminary relief is generally allowed only as a prohibitory injunction,[8] a form of *in personam* equitable relief preventing parties to the litigation from taking certain actions.[9]

---

[7] *See Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) ("The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held."); *see also Fitzgerald v. Mountain Laurel Racing, Inc.*, 607 F.2d 589, 604 n.24 (3d Cir. 1979) (explaining that an order granting a preliminary injunction was drawn narrowly such that it did not "extend[] beyond a period of time necessary to preserve the *status quo ante*" (emphasis added)).

[8] In the rarest and most extreme cases, and only upon satisfaction of a "particularly heavy burden" and an "indisputably clear" right to relief, this Court has permitted preliminary relief in the form of a mandatory injunction. *Hope v. Warden York Cnty. Prison*, 972 F.3d 310, 320 (3d Cir. 2020) (first quoting *Acierno v. New Castle County*, 40 F.3d 645, 653 (3d Cir. 1994); then quoting *Trinity Indus., Inc. v. Chi. Bridge & Iron Co.*, 735 F.3d 131, 139 (3d Cir. 2013)). *See, e.g.*, *Kim v. Hanlon*, 99 F.4th 140, 147, 152 (3d Cir. 2024) (affirming a mandatory preliminary injunction that required county clerks to group candidates "by the offices for which they are running" in a primary election); *Amalgamated Transit Union Loc. 85 v. Port Auth. of Allegheny Cnty.*, 39 F.4th 95, 101 (3d Cir. 2022) (affirming a mandatory preliminary injunction that required an employer to rescind its discipline of its employees); *Osorio-Martinez v. Att'y Gen.*, 893 F.3d 153, 178–79 (3d Cir. 2018) (reversing the denial of a mandatory preliminary injunction to require petitioners' release from immigration detention).

[9] *Cf. Elliott v. Kiesewetter*, 98 F.3d 47, 56 n.5 (3d Cir. 1996) ("A non-party cannot be bound by the terms of an injunction unless the non-party is found to be acting 'in active concert or participation' with the party against whom injunctive relief is sought" (quoting Fed. R. Civ. P. 65(d))).

As equitable relief, a preliminary injunction may not be awarded as of right; rather it is dependent on the exercise of judicial discretion. *See Transcon. Gas Pipe Line Co. v. Pa. Env't Hearing Bd.*, 108 F.4th 144, 150 (3d Cir. 2024). That discretion is guided by four considerations for which the movant bears the burden of proof:

1. A reasonable probability of success on the merits of the claim for which injunctive relief is sought;

2. An irreparable harm in the absence of preliminary injunctive relief;

3. A balancing of the equities associated with the possibilities of harms to other interested persons resulting from the grant or denial of injunctive relief; and

4. An assessment of the public interest.

*Erie Indem. Co. v. Stephenson*, 157 F.4th 265, 275 (3d Cir. 2025) (quoting *Transcon. Gas*, 108 F.4th at 150); *see also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The first two showings are necessary – a preliminary injunction cannot be issued unless they are satisfied. *See Transcon. Gas*, 108 F.4th at 150. If they are, then all four factors bear on a district court's exercise of discretion in resolving the motion. *See id.* at 150–51.[10]

---

[10] In the context of a motion for a stay pending appeal, which is governed by a similar four-factor analytical framework, the third factor (balancing of the hardships) and the fourth factor (weighing the public interest) "merge" when the federal government is a party to the case. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Even if that rule were applied outside of the stay context, it would not have ready application to cases in

On appeal, a district court's preliminary-injunction ruling is reviewed *de novo* for questions of law, for clear error as to factual findings, and for an abuse of discretion with respect to the exercise of equitable discretion. *See Erie Indem.*, 157 F.4th at 276.[11]

Here, the requested injunctive relief is in response to the Kingston Defendants' enforcement of both the Building Code and the 2023 Zoning Ordinance. Violations of the Building Code were the stated reasons for originally condemning both properties. And provisions in the 2023 Zoning Ordinance were the grounds for the perpetuation of the condemnation orders, the inability to quickly and easily permit the proposed exercise of religion on the properties, and the threatened daily fines of $500. Because the appropriateness of equitable relief may depend on whether the challenged enforcement actions were based on the Building Code or on the 2023 Zoning Ordinance, the preliminary-injunction analysis is conducted separately for the two sets of challenges.

### A. Preliminary Injunctive Relief with Respect to Enforcement of the Building Code

With respect to the enforcement of the Building Code, Rabbi Hellinger and his congregation sought to preliminarily enjoin the Kingston Defendants from maintaining the condemnation orders for the Pierce Street properties. They did so based on their RLUIPA substantial-burden claim.

---

which one of the parties is a municipal government because municipal interests may diverge from or conflict with federal interests. Thus, in cases not involving the federal government, there is still value in balancing the hardships separately from consideration of the public interest.

[11] *But cf. Camenisch*, 451 U.S. at 395 ("[T]he findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits.").

### 1. RLUIPA's Land-Use Substantial-Burden Provision

RLUIPA protects the use of real property for religious exercise in several respects. *See generally* 42 U.S.C. § 2000cc. Three of those land-use provisions apply to religious assemblies, religious institutions, and/or religious structures.[12] Another protects the religious exercise of *persons* – inclusive of religious assemblies and institutions – from land use regulations that substantially burden their religious exercise. *See id.* § 2000cc(a)(1) (explicitly "including a religious assembly or institution" in its definition of "a person"); *see also* 1 U.S.C. § 1 (defining 'person' broadly); *cf. Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 705–19 (2014) (holding that, as a corporation was a 'person' under 1 U.S.C. § 1, it can exercise religion for purposes of the Religious Freedom Restoration Act's substantial-burden provision, *see* 42 U.S.C. § 2000bb-1(a)–(b)).

To redress violations of any of its protections, RLUIPA provides a private cause of action against a 'government,' 42 U.S.C. § 2000cc-2(a), defined broadly to include not only states, counties, and municipalities but also persons acting under color of state law, *id.* § 2000cc-5(4)(A); *see also id.* § 2000cc-2(a) ("A person may assert a violation of this chapter as a claim or defense in a judicial proceeding and obtain

---

[12] *See* 42 U.S.C. § 2000cc(b)(1) (prohibiting governments from imposing a land use regulation that treats religious assemblies or institutions on "less than equal terms with a nonreligious assembly or institution"); *id.* § 2000cc(b)(2) (prohibiting governments from imposing a land use regulation that "discriminates against any assembly or institution on the basis of religion or religious denomination"); *id.* § 2000cc(b)(3) (prohibiting governments from imposing a land use regulation that "totally excludes religious assemblies from a jurisdiction" or "unreasonably limits religious assemblies, institutions, or structures within a jurisdiction").

appropriate relief against a government."). That private cause of action is governed by a burden-shifting framework, which starts with a RLUIPA plaintiff's obligation to make a *prima facie* showing of a violation of one of RLUIPA's land-use provisions (or of the Free Exercise Clause). *See id.* § 2000cc-2(b). A RLUIPA defendant may rebut a *prima facie* case, but in doing so, it bears the burden of proof. *See id.*; *see also New Harvest Christian Fellowship v. City of Salinas*, 29 F.4th 596, 601–02 (9th Cir. 2022) (explaining that once a RLUIPA plaintiff "establishes that it has experienced a substantial burden," then "the burden shift[s] to the [defendant] to show that its" imposition of that burden "is narrowly tailored to accomplish a compelling governmental interest").

For a substantial-burden claim under RLUIPA's land-use provisions, a *prima facie* case consists of three elements:

1. a land use regulation;[13]

2. that was imposed or implemented by a government;[14]

3. in a manner that imposes a substantial burden on the religious exercise of a person, assembly, or institution.[15]

If a RLUIPA plaintiff makes those showings, then to avoid liability, a RLUIPA defendant must "demonstrate" that imposing the substantial burden:

---

[13] *See* 42 U.S.C. § 2000cc(a)(1); *see also id.* § 2000cc-5(5) (defining 'land use regulation').

[14] *See* 42 U.S.C. § 2000cc(a)(1); *see also id.* § 2000cc-5(4) (defining 'government').

[15] *See* 42 U.S.C. § 2000cc(a)(1); *see also id.* § 2000cc-5(7) (giving meaning to the term 'religious exercise').

(A)    is in furtherance of a compelling governmental interest; and

(B)    is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc(a)(1); *see also id.* § 2000cc-5(2) (defining 'demonstrates' as "meets the burdens of going forward with the evidence and of persuasion").

Applied here, for Rabbi Hellinger and Anash to have a likelihood of success on the merits for their substantial-burden claim, it must be likely that they can make a *prima facie* case and that the Kingston Defendants cannot make at least one of the counter-showings.

> ### 2. *The Ability to Obtain Preliminary Injunctive Relief from Building Code Violations Under RLUIPA's Land-Use Substantial-Burden Provision*

The first element of a *prima facie* case – a land use regulation – poses an obstacle for Rabbi Hellinger and his congregation. As defined by RLUIPA, the term 'land use regulation' encompasses "zoning and landmarking law[s]" without reference to building codes:

> The term 'land use regulation' means a zoning or landmarking law, or the application of such a law, that limits or restricts a claimant's use or development of land (including a structure affixed to land), if the claimant has an ownership, leasehold, easement, servitude, or other property interest in the regulated land or a contract or option to acquire such an interest.

*Id.* § 2000cc-5(5). It may be that some provisions in a building code, including Kingston's, still govern zoning or landmarking or constitute applications of zoning and landmarking laws, and

22

thus would be within RLUIPA's definition of 'land use regulation.'[16]  But the identified provisions of the Building Code on which the violations here were based – those for a lack of sprinklers, fire extinguishers, egress signage, and emergency lights, as well as for open electrical issues – apply regardless of the zoning district or the landmarking status of the buildings, and thus they do not qualify as land use regulations within the scope of RLUIPA.

Rabbi Hellinger and his congregation therefore do not have a likelihood of satisfying the first element of a *prima facie* case, and hence they have no likelihood of success on the merits of their substantial-burden claim with respect to the enforcement of the Building Code.  Consequently, it was not error for the District Court to deny preliminary injunctive relief on that ground.  *See Transcon. Gas*, 108 F.4th at 150 (explaining that

---

[16] *Compare Redeemed Christian Church of God (Victory Temple) Bowie v. Prince George's County*, 17 F.4th 497, 506–09 (4th Cir. 2021) (holding that a county's legislative amendment to its "Water and Sewer Plan" was a 'land use regulation' under RLUIPA because it "divide[d] the relevant area into different categories, each of which impact[ed] land use and restrict[ed] or permit[ted] a property's development"), *and Fortress Bible Church v. Feiner*, 694 F.3d 208, 215–18 (2d Cir. 2012) (holding that a town's "environmental quality statute," though "by itself . . . not a zoning law," fell within the ambit of RLUIPA because "in this case the [t]own used the [environmental quality statute] review process as its vehicle for determining the zoning issues related to [a] [c]hurch's land use proposal"), *with St. John's United Church of Christ v. City of Chicago*, 502 F.3d 626, 641 (7th Cir. 2007) (holding that a city's exercise of eminent domain was not a 'land use regulation' under RLUIPA), *and Prater v. City of Burnside*, 289 F.3d 417, 434 (6th Cir. 2002) (holding that a city's decision to develop a dedicated roadway pursuant to its ownership interest in that property was not an imposition or implementation of a 'land use regulation').

a showing of likelihood of success on the merits is a required element for a preliminary injunction).

### B. Preliminary Injunctive Relief with Respect to the Enforcement of the 2023 Zoning Ordinance as to the Pierce Street Properties

#### 1. *Likelihood of Success on the Merits*

Rabbi Hellinger and his congregation also seek to enjoin the Kingston Defendants from enforcing the 2023 Zoning Ordinance against the Pierce Street properties on several grounds. As far as RLUIPA violations, they claim that the ordinance imposes a substantial burden on their religious exercise, *see* 42 U.S.C. § 2000cc(a)(1); that it implements a land use regulation for a religious assembly or institution on less than equal terms than a nonreligious assembly or institution, *see id.* § 2000cc(b)(1); and that it unreasonably limits religious assemblies, institutions, and structures, *see id.* § 2000cc(b)(3)(B). They also rely on a procedural-due-process claim.

For Rabbi Hellinger and Anash to have a likelihood of success on the first of those claims – the substantial-burden claim – it must be likely that they could make a *prima facie* case and that the Kingston Defendants could not make at least one of the counter-showings. *See id.* §§ 2000cc(a)(1), 2000cc-2(b).

#### a. The *Prima Facie* Showing of a Substantial Burden

It is likely that Rabbi Hellinger and his congregation will be able to establish a *prima facie* substantial-burden claim.

First, as to the land-use-regulation requirement, the 2023 Zoning Ordinance likely qualifies as a 'land use regulation' under RLUIPA because it regulates zoning within Kingston. *See* 42 U.S.C. § 2000cc-5(5).

24

Second, the requirement that the land use regulation be imposed or implemented by a government is likely met. Each of the Kingston Defendants is within RLUIPA's definition of 'government.' *See id.* § 2000cc-5(4)(A). And their challenged actions are based on the implementation of the 2023 Zoning Ordinance – denying access to and use of the Pierce Street properties by perpetuating the effect of the condemnation orders, providing no quick and easy means of permitting the exercise of religion on the properties, and threatening daily citations of $500.

Third, it is likely that the implementation of the 2023 Zoning Ordinance substantially burdens Rabbi Hellinger and his congregation's religious exercise. The meaning of 'substantial burden' as used in RLUIPA's prohibitions regarding land use regulations presents a novel question for this Circuit.[17] By way of reference point, in *Washington v.*

---

[17] Our sister circuits have taken a variety of approaches to the substantial-burden standard in the context of land use regulations. *See, e.g.*, *Roman Cath. Bishop of Springfield v. City of Springfield*, 724 F.3d 78, 94–97 (1st Cir. 2013) (using a multi-factor functional approach to assess a substantial burden); *Westchester Day Sch. v. Village of Mamaroneck*, 504 F.3d 338, 349–52 (2d Cir. 2007) (considering multiple factors in connection with the substantial-burden standard, including the feasibility of alternative locations); *Bethel World Outreach Ministries v. Montgomery Cnty. Council*, 706 F.3d 548, 556 (4th Cir. 2013) (explaining that the substantial-burden standard is satisfied by proof that a "government regulation puts substantial pressure on [a plaintiff] to modify its behavior"); *Livingston Christian Schs. v. Genoa Charter Township*, 858 F.3d 996, 1003–05 (6th Cir. 2017) (requiring "some degree of severity" for a burden "to be considered 'substantial'" and also considering multiple other factors); *C.L. for Urb. Believers v. City of Chicago*, 342 F.3d 752, 761 (7th Cir. 2003) (requiring that the land use regulation bear "a direct, primary, and fundamental responsibility for rendering

25

*Klem*, 497 F.3d 272 (3d Cir. 2007), this Court gave meaning to the term 'substantial burden' in the context of RLUIPA's protections for institutionalized persons. In doing so, *Washington* recognized the separateness of the two substantial-burden protections – those for institutionalized persons and those for land use – and expressly stated that the land-use protections were "not applicable" in the institutionalized person context. *Id.* at 277. From there, *Washington* looked to two Supreme Court decisions – *Sherbert v. Verner*, 374 U.S. 398 (1963), and *Thomas v. Review Board of the Indiana Employment Security Division*, 450 U.S. 707 (1981) – involving the denial of government-provided benefits based on a sincerely held religious belief. *Washington*, 497 F.3d at 278–79 (citing *Sherbert*, 374 U.S. at 404, 406 n.6, for its analysis of the denial of unemployment benefits based on job discharge stemming from sabbath observances, and *Thomas*, 450 U.S. at

---

religious exercise—including the use of real property for the purpose thereof within the regulated jurisdiction generally—effectively impracticable" for there to be a substantial burden); *Marianist Province of U.S. v. City of Kirkwood*, 944 F.3d 996, 1001 (8th Cir. 2019) (holding that a burden was not substantial when there were "feasible alternative locations for religious exercise"); *Guru Nanak Sikh Soc'y of Yuba City v. County of Sutter*, 456 F.3d 978, 988 (9th Cir. 2006) ("[F]or a land use regulation to impose a 'substantial burden,' it must be 'oppressive' to a 'significantly great' extent." (alteration in original) (quoting *S.J. Christian Coll. v. City of Morgan Hill*, 360 F.3d 1024, 1034 (9th Cir. 2004))); *Grace United Methodist Church v. City of Cheyenne*, 451 F.3d 643, 660 n.4, 661–63 (10th Cir. 2006) (holding that to be substantial, a burden did not have to relate to "fundamental" religious activities); *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1227 (11th Cir. 2004) (explaining that to be substantial, a burden "must place more than an inconvenience on religious exercise," and rather must involve "significant pressure which directly coerces the religious adherent to conform his or her behavior accordingly").

26

717–18, for its analysis of the denial of unemployment benefits stemming from an employee quitting due to refusal to produce materials used in war).

Relying primarily on those two cases, *Washington* identified two circumstances in which an institutionalized person could experience a RLUIPA-protected substantial burden on religious exercise. The first occurs when such a person is "forced to choose between following the precepts of his religion and forfeiting benefits otherwise generally available to other inmates." *Id.* at 280. The second takes place when "the government puts substantial pressure on an adherent to substantially modify his behavior and to violate his beliefs." *Id.*

Subsequently, in *Holt v. Hobbs*, 574 U.S. 352 (2015), the Supreme Court adjudicated a RLUIPA substantial-burden claim by an institutionalized person. It held that a prison policy that required an inmate to "engage in conduct that seriously violates [his] religious beliefs" was a substantial burden. *Id.* at 361 (alteration in original) (quoting *Hobby Lobby*, 573 U.S. at 720). That decision is consistent with the *Washington* formulation in that they both focus on conflicts with an inmate's religious *beliefs*. But unlike this Court in *Washington*, the Supreme Court did not explicitly confine the substantial-burden claim for institutionalized persons to only two situations. *Id.* at 361–62.

Nonetheless, *Washington* provides a reference point for evaluating the meaning of 'substantial burden' in the context of RLUIPA's land-use protections. That is so because, although they are not identical, RLUIPA's institutionalized-persons provisions and its land-use provisions both use a substantial-burden standard subject to strict scrutiny. *Compare* 42 U.S.C. § 2000cc-1(a), *with id.* § 2000cc(a)(1). The structural similarity allows the situations identified in *Washington* under which RLUIPA protects religious beliefs of institutionalized persons to be translated into the land-use

27

context by accounting for the differences between the two statutory provisions. That may be done by extending the protections for institutionalized persons to all persons – including religious assemblies and institutions, *see id.* § 2000cc(a)(1) – and by linking those protections to the imposition or implementation of a land use regulation, *see id.* Doing so yields two substantial-burden scenarios – both related to the protection of religious belief. The first occurs when a person is forced to choose between following the precepts of his religion and avoiding the effect of a land use regulation. *Cf. Washington*, 497 F.3d at 280. The second occurs when a land use regulation places substantial pressure on a person to substantially modify his behavior in violation of his beliefs. *Cf. id.* [18]

---

[18] The two Supreme Court cases relied on in *Washington* to formulate the two-part definition of 'substantial burden' for institutionalized persons do not pose any obstacle to a broader understanding of the term 'substantial burden' in the land-use context. Both of those cases – *Sherbert* and *Thomas* – involved the denial of benefits based on actions inspired by religious belief, and a land use regulation may substantially burden religious exercise in different ways than the denial of benefits may substantially burden religious exercise. *See Bethel World Outreach*, 706 F.3d at 555 (contrasting the land-use context with the institutionalized-persons context and observing that "[e]ven government action preventing a religious organization from building a church will rarely, if ever, force the organization to violate its religious beliefs, because the organization can usually locate its church elsewhere," and thus "requiring a religious organization to prove that a land use regulation pressured it to violate its beliefs would be tantamount to eliminating RLUIPA's substantial burden protection in the land use context"); *cf. Westchester*, 504 F.3d at 348–49 (explaining that "in the context of land use, a religious institution is not ordinarily faced with the same

28

There may be a temptation to conclude that those protection-of-belief scenarios define the scope of RLUIPA's land-use substantial-burden protections. But RLUIPA shields more than just religious beliefs; it protects 'religious exercise,' defined as "any exercise of religion" including the use of real property for religious exercise. 42 U.S.C. § 2000cc-5(7)(A)–(B); *cf. generally Emp. Div., Dep't of Hum. Res. of Or. v. Smith*, 494 U.S. 872, 887 (1990) (explaining that "the 'exercise of religion' often involves not only belief and profession but the performance of (or abstention from) physical acts").

Furthermore, RLUIPA's substantial-burden provision is considerably broader for land use regulation than for institutionalized persons in several respects. *Compare* 42 U.S.C. § 2000cc(a), *with id.* § 2000cc-1. As a baseline, RLUIPA identifies two broad categories of permissible applicability for its substantial-burden protections for institutionalized persons: (i) for programs or activities that have received federal financial assistance, *see id.* § 2000cc-1(b)(1), and (ii) for substantial burdens that affect foreign, interstate, or tribal commerce, *see id.* § 2000cc-1(b)(2). In addition to those, RLUIPA includes a third category of permissible application for its religious land-use protections: in situations involving "individualized assessments of the proposed uses for the property involved." *Id.* § 2000cc(a)(2)(C).[19] Moreover, in the land-use context, the substantial-burden provision is not limited to institutionalized

---

dilemma of choosing between religious precepts and government benefits").

[19] The RLUIPA claims by Rabbi Hellinger and Anash are within, if nothing else, that final category – individualized assessments of proposed property uses, *see* 42 U.S.C. § 2000cc(a)(2)(C) – because they are traceable to the Kingston Defendants' individualized determinations of the 2023 Zoning Ordinance's applicability to the proposed uses of the Pierce Street properties.

persons but instead applies to all 'persons,' which, as defined, includes religious assemblies and institutions, *id.* § 2000cc(a)(1), as well as "corporations, companies, associations, firms, partnerships, societies, and joint stock companies," 1 U.S.C. § 1; *cf. Hobby Lobby*, 573 U.S. at 707–19.[20]

---

[20] Rabbi Hellinger, as a natural person, constitutes a 'person' protected by RLUIPA. *See* 1 U.S.C. § 1; *cf. Hobby Lobby*, 573 U.S. at 707–09. And Anash constitutes an 'assembly' within the common and ordinary meaning of that term at the time of RLUIPA's enactment. *See Assembly*, *Merriam–Webster's Dictionary of Law* 34 (1st ed. 1996) (defining an 'assembly' in relevant part as "a company of persons collected together in one place usu[ally] for some common purpose"); *Assembly*, *Webster's New World College Dictionary* 82 (3d ed. 1996) (defining an 'assembly' in relevant part as "a group of persons gathered together, as for worship, instruction, or entertainment"); *see also Lighthouse Inst. for Evangelism, Inc. v. City of Long Branch*, 510 F.3d 253, 284 n.29 (3d Cir. 2007) (Jordan, J., concurring in part and dissenting in part) (relying on dictionary definitions to explain that an "'assembly' is defined as 'a company of persons gathered together for deliberation and legislation, worship, or entertainment,'" or as "[a] group of persons organized and united for some common purpose" (alteration in original) (first quoting *Assembly*, *Merriam–Webster's Collegiate Dictionary* 69 (10th ed. 2002), then quoting *Assembly*, *Black's Law Dictionary* 111 (7th ed. 1999))); *Tree of Life Christian Schs. v. City of Upper Arlington*, 905 F.3d 357, 378 (6th Cir. 2018) (Thapar, J., dissenting) (citing dictionary definitions to explain that an "'assembly' is '[a] group of persons gathered together for a common reason,'" or "a group of persons gathered together, usually for a particular purpose, whether religious, political, educational, or social" (alteration in original) (first quoting *American Heritage Dictionary of the English Language* (4th ed. 2000), then quoting *Webster's Encyclopedic*

For those reasons, there is a strong textual basis for reading RLUIPA's substantial-burden protections for religious land use more expansively than its substantial-burden protections for institutionalized persons. *Cf.* 42 U.S.C. § 2000cc-3(g) (instructing that RLUIPA "be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by [its terms] and the Constitution"). And RLUIPA's text provides guideposts for assessing the additional breadth of meaning for the term 'substantial burden' in the land-use context. It requires a burden on religious exercise resulting from a government's imposition or implementation of a land use regulation. *See id.* § 2000cc(a)(1). The burden must be "substantial" as well, *id.*, and that is primarily a question of degree, evaluated against the backdrop of RLUIPA's capacious definition of 'religious exercise,' which includes "any exercise of religion" as well as "the use, building, or conversion of real property for the purpose of religious exercise," *id.* § 2000cc-5(7)(A)–(B). Thus, the greater the nexus between a land use regulation and religious exercise, the greater the likelihood that the land use regulation will substantially burden religious exercise.

Application of that principle in light of other provisions in RLUIPA produces specific legal rules in at least three scenarios. First, a land use regulation imposes a substantial burden on religious exercise if it restricts *access* to real property that is otherwise available for the proposed exercise of religion.[21] Second, a land use regulation – even one of

<hr>

*Unabridged Dictionary of the English Language* (1996))). *See generally United States v. Adair*, 38 F.4th 341, 350 (3d Cir. 2022) ("To discern the common ordinary meaning of [a] term[] at the time of [a statute's] promulgation, it is permissible to consult contemporary dictionaries.").

[21] The limiting phrase 'otherwise available for the proposed exercise of religion' accounts for the statutory terms 'land use regulation' and 'government.' Because a substantial-burden claim applies only to "land use regulation[s]," 42 U.S.C.

31

general applicability – imposes a substantial burden if it limits the *use* of real property that is otherwise available for the proposed exercise of religion so as to prevent the proposed exercise of religion on the property. Third, even when the imposition or implementation of a land use regulation does not directly impede religious exercise, the land use regulation may still impose a substantial burden if it has a *significant adverse effect* on real property that is used or otherwise available for

§ 2000cc(a)(1), there is not a substantial burden under RLUIPA when another source of law independently prevents the use of the property for the proposed religious exercise. And because RLUIPA covers only "government[s]," *id.*, there is not a substantial burden when non-governmental actors have and exercise property rights to independently restrict a proposed religious exercise. *See Adderley v. Florida*, 385 U.S. 39, 47 (1966) ("[A] private owner of property[] has power to preserve the property under its control for the use to which it is lawfully dedicated."). *Cf. Cedar Point Nursery v. Hassid*, 594 U.S. 139, 149 (2021) ("The right to exclude is 'one of the most treasured' rights of property ownership." (quoting *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 (1982))). By contrast, the substantial-burden formulation advanced by our dissenting colleague does not fully appreciate that RLUIPA regulates "land use regulations" imposed by "government[s]," 42 U.S.C. § 2000cc(a)(1), and that leads to the erroneous conclusions that the substantial-burden analysis may "consider[] the plaintiff's 'own actions,'" Dissent Op. at 5 (quoting *Livingston Christian Schs.*, 858 F.3d at 1004), and that it should examine "whether the plaintiff had a reasonable expectation of religious land use or whether the plaintiff's burden was self-imposed," *id.* at 4. RLUIPA protects the exercise of religion, and it has no provisions for scrutinizing the actions or expectations of persons seeking to exercise religion. Unlike First Amendment jurisprudence, *see, e.g.*, *Frazee v. Ill. Dep't of Emp. Sec.*, 489 U.S. 829, 833–34 (1989), RLUIPA does not impose a sincerity-of-belief prerequisite for its protections, *see* 42 U.S.C. §§ 2000cc–2000cc-5.

32

the proposed exercise of religion. *Cf. Thomas*, 450 U.S. at 718 (recognizing that "indirect" compulsion may still be a substantial infringement on the exercise of religion).

Aspects of the claims brought by Rabbi Hellinger and his congregation are within each of those three scenarios.

First, because Kingston relies on the stated non-compliance of the Pierce Street properties with the 2023 Zoning Ordinance as a means of perpetuating the condemnation orders, the implementation of the 2023 Zoning Ordinance restricts access to real property used for religious exercise and thus imposes a substantial burden on religious exercise.

Second, because Kingston has taken the position that there is no way to "quickly or easily" allow the use of 239 Pierce Street for religious group living, the implementation of the 2023 Zoning Ordinance limits the use of real property in a way that prevents religious exercise on that property. Letter from Harry P. Mattern, Municipal Solicitor, Municipality of Kingston, to David Schwager, Attorney for Rabbi Hellinger (Oct. 4, 2023) (JA209).

Third, because Kingston relies on the 2023 Zoning Ordinance as the basis for the threatened daily citations of $500 per Pierce Street property, the implementation of the 2023 Zoning Ordinance has a significant adverse effect on real property used for religious exercise. The threat of daily citations in any amount is an adverse effect. And here that effect is likely significant. As a benchmark, the purchase price of 239 Pierce Street in 2019 was $45,000 and the purchase price of 44 Pierce Street in 2021 was $134,000. In light of those figures, and even accounting for inflation, daily $500 fines would quickly amount to sizeable liability relative to the approximate property values of the two properties. Hence, the threatened $500 daily fines would likely have significant adverse effects on the Pierce Street properties and consequently be a substantial burden on Rabbi Hellinger and

33

his congregation.  *Cf. Hobby Lobby*, 573 U.S. at 726 (concluding that a requirement to pay "an enormous sum of money" for action in accordance with religious belief "clearly imposes a substantial burden on those beliefs").

For those reasons, Rabbi Hellinger and his congregation have shown a likelihood that they will prove a *prima facie* case for their substantial-burden claim.

### b. The Burden Shift to the Kingston Defendants

With that assessment, the analysis of the likelihood of success of the substantial-burden claim depends on the likelihood that the Kingston Defendants will make the requisite counter-showings of a compelling governmental interest and implementation through the least restrictive means.  As used in tandem in RLUIPA, 'compelling governmental interest' and 'least restrictive means' are specialized terms that implement the strict-scrutiny standard used in constitutional law.  *See Lighthouse Inst. for Evangelism, Inc. v. City of Long Branch*, 510 F.3d 253, 269 (3d Cir. 2007) (explaining that "the [s]ubstantial [b]urden section includes a strict scrutiny provision").[22]

---

[22] *See also Centro Familiar Cristiano Buenas Nuevas v. City of Yuma*, 651 F.3d 1163, 1171 (9th Cir. 2011) (explaining that "[t]he Constitutional phrases, 'substantial burden,' 'compelling governmental interest,' and 'least restrictive means,' are all included in the 'substantial burden' provision" (citing 42 U.S.C. § 2000cc(a)(1))); *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 292 n.12 (5th Cir. 2012) (stating in the context of a claim under RLUIPA's equal-terms provision, *see* 42 U.S.C. § 2000cc(b)(1), that "strict scrutiny is the proper test for claims under the [s]ubstantial [b]urden [c]lause" (citing 42 U.S.C. § 2000cc(a))); *cf. Thomas*, 450 U.S. at 718–19 (determining that "[t]he state may justify an inroad on religious liberty by showing that it is the least restrictive

The first of those terms, 'compelling interest,' refers to an interest "of the highest order." *Wisconsin v. Yoder*, 406 U.S. 205, 215 (1972). Such an interest, therefore, is greater than the 'important interest' required for intermediate or exacting scrutiny and much greater than the 'legitimate interest' required for rational basis review.[23]

In light of that understanding, it is quite unlikely that the Kingston Defendants will be able to demonstrate a compelling interest for the substantial burdens at issue here: (i) the prolonged condemnation of the Pierce Street properties based on the 2023 Zoning Ordinance; (ii) Kingston's inability to quickly and easily allow use of 239 Pierce Street for religious group living under the 2023 Zoning Ordinance; and (iii) the imminent daily $500 fines for each Pierce Street property for violations of the 2023 Zoning Ordinance.

---

means of achieving some compelling state interest" and that "[n]either of the interests advanced is sufficiently compelling to justify the burden" on religious liberty at issue).

[23] *See Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 607 (2021) (comparing strict scrutiny, where "the government must adopt 'the least restrictive means of achieving a compelling state interest,'" to exacting scrutiny, which requires "a means substantially related to a sufficiently important interest" (quoting *McCullen v. Coakley*, 573 U.S. 464, 478 (2014))); *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439–42 (1985) (characterizing the standard of review based on 'compelling interest' requirements as heightened compared with those based on 'important' and 'legitimate' interests); *cf. Priests for Life v. HHS*, 808 F.3d 1, 21 (D.C. Cir. 2015) (Kavanaugh, J., dissenting from the denial of rehearing en banc) ("No code or history book lists the Government's compelling interests. Rather, courts have developed those interests over time, in common-law-like fashion.").

First, it is unlikely that the Kingston Defendants will be able to demonstrate a compelling governmental interest in perpetuating the condemnation orders after the Building Code violations have been remediated. A municipality's interest in land use regulation may be legitimate, and possibly important or even compelling in some rare situations.[24] But the implementation of the 2023 Zoning Ordinance in a manner to prevent access to and use of the Pierce Street properties once they are compliant with the Building Code is not a "highest order" governmental interest. *Id.* at 215. Therefore, the Kingston Defendants are not likely to demonstrate a compelling governmental interest in perpetuating the condemnation orders.

Second, because they rely on the 2023 Zoning Ordinance to deny Rabbi Hellinger and his congregation the ability to use 239 Pierce Street, the Kingston Defendants also have to show a compelling governmental interest in the lack of a quick and easy means for allowing the proposed – and previously permitted – uses of the properties. Yet other than allusions to

---

[24] *Compare Whitton v. City of Gladstone*, 54 F.3d 1400, 1408 (8th Cir. 1995) ("[A] municipality's asserted interests in traffic safety and aesthetics, while significant, have never been held to be compelling."), *and Thai Meditation Ass'n of Ala., Inc. v. City of Mobile*, 83 F.4th 922, 929–31 (11th Cir. 2023) (concluding, in a case that involved a RLUIPA substantial-burden claim concerning a land use regulation as well as a state law that "like RLUIPA, require[d] the government's action to satisfy strict scrutiny to survive review," that for the state law, a "generalized invocation[] of [a] government interest[] in 'zoning'" is "insufficient to carry the government's burden" to show a compelling interest), *with Redeemed Christian Church*, 17 F.4th at 510 (explaining that a "compelling interest" is one that implicates "the government's paramount interest in protecting physical or mental health, public safety, or public welfare" (quoting *Am. Life League, Inc. v. Reno*, 47 F.3d 642, 655 (4th Cir. 1995)))).

health and safety concerns, the Kingston Defendants do not provide any justification for their predicted delays associated with permitting religious group living on that property. In that respect, too, they have failed to establish a compelling governmental interest for their implementation of the 2023 Zoning Ordinance.[25]

Third, the Kingston Defendants' interests in threatening daily $500 citations for violations of the 2023 Zoning Ordinance are likewise dubious. The stated basis for the zoning violation with respect to 239 Pierce Street was a moving target. Kingston started by asserting that the property was used as a rooming/boarding house, and switched to insist that the building was used as a dormitory. Neither works well. Under the 2023 Zoning Ordinance, to be a 'rooming and/or boarding house,' such a property "contains rooms which are rented or leased," Municipality of Kingston, Pa., Zoning Ordinance § 203, but the residents of 239 Pierce Street did not pay rent, and there is no evidence that they had leases, as they were considered congregants rather than tenants. Moreover, the 2023 Zoning Ordinance does not even define the term 'dormitory,' much less provide any zoning regulations with respect to dormitories. *Id.* (showing no listing of 'dormitory'

---

[25] *See Hobbs*, 574 U.S. at 363 (explaining in the context of a substantial-burden claim under RLUIPA's protections for the religious exercise of institutionalized persons that the compelling interest test requires "application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened" (quoting *Hobby Lobby*, 573 U.S. at 726)); *Westchester*, 504 F.3d at 353 (explaining in the context of a RLUIPA substantial-burden claim concerning a land use regulation that the government must "show a compelling interest in imposing the burden on religious exercise in the particular case at hand, not a compelling interest in general" (citing *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 432 (2006))).

where such definition would be in alphabetical listing); *see also id.* (providing the sole mention of 'dormitory' in 2023 Zoning Ordinance stating that it is excluded from the definition of 'rooming house'). As far as 44 Pierce Street, the proposed citation was predicated on its use as a 'school.' But as defined by the 2023 Zoning Ordinance, a school must be licensed by the state. *Id.* And Kingston admitted that it knew that the 44 Pierce Street property was not licensed by the Commonwealth. It is therefore likely that 44 Pierce Street could not meet the definition of a 'school.' Hence, the rationales for the threatened daily citations are precarious – much closer to illegitimate motives than compelling governmental interests.[26]

---

[26] In deciding that Rabbi Hellinger and his congregation were not likely to succeed on the merits of their substantial-burden claim, the District Court opined that Rabbi Hellinger had not established religious animus or discriminatory intent by the Kingston Defendants. *Anash*, 2024 WL 5294369, at *7. That assessment appears to be based on the absence of direct evidence, as the District Court did not consider the cumulative significance of circumstantial evidence of animus or discriminatory intent. That includes the unexplained change in the designation of 239 Pierce Street from a rooming/boarding house to a dormitory; the treatment of 239 Pierce Street as a 'dormitory' despite that term being undefined in the 2023 Zoning Ordinance; the treatment of 44 Pierce Street as a 'school' despite its inability to meet the definition of a 'school' in the 2023 Zoning Ordinance; the threat of daily fines in the maximum allowed amount of $500 for non-compliance with the 2023 Zoning Ordinance; the statement in the Zoning Officer's administrative search warrant for 239 Pierce Street that no adult supervision was observed despite the investigative file containing a photo of an adult walking with two children; the assertions in each of the administrative warrant applications that Rabbi Hellinger failed to register as a landlord, despite the residents at 239 Pierce Street not meeting

One of the key justifications the District Court provided for its contrary conclusion was the lack of evidence by Rabbi Hellinger and Anash that other properties were unavailable as living quarters for his congregant-students and for the purposes of a yeshiva. *Anash*, 2024 WL 5294369, at *4–7. Without Rabbi Hellinger or Anash disproving the feasibility of alternative locations for their exercise of religion, the District Court reasoned that the condemnation orders did not substantially burden religious exercise. *Id.* at *7.

Our dissenting colleague also shares that view, *see* Dissent Op. at 4, 6–7, but the feasible-alternative-locations rationale cannot stand in light of RLUIPA. For context, there are several reasons why governments may not want real property used for religious exercise. Houses of worship may be exempt from property taxes.[27] Religious exercise may also be viewed as not

---

the relevant definition of 'tenants,' Kingston Mun. Code § 116-3, and despite the absence of evidence that anyone ever resided at 44 Pierce Street; and the execution of the administrative warrants and subsequent condemnation of the Pierce Street properties on the day before Rosh Hashanah and the commencement of the High Holy Days, *cf. Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632, 639–41 (3d Cir. 1993) (explaining in the context of a Title VII claim that the timing of events "may raise an inference of discrimination"). *Cf. generally Westchester*, 504 F.3d at 353 (recognizing that "undue deference to the opposition of a small group of neighbors" may lead to the imposition of a substantial burden on religious exercise); *Fortress Bible Church*, 694 F.3d at 219 (acknowledging that actions taken in bad faith may impose a substantial burden "because it appears that the applicant may have been discriminated against on the basis of its status as a religious institution").

[27] *See* Douglas Laycock & Luke W. Goodrich, *RLUIPA: Necessary, Modest, and Under-Enforced*, 39 Fordham Urb. L.J. 1021, 1021 (May 2012) (explaining that churches "are unpopular with city officials because they are tax exempt");

spurring job growth or generating commercial activity.[28]  And religious exercise can strain infrastructure, such as by increasing traffic and the demand for parking.[29]  In addition, some residents may disfavor some forms of religious exercise.[30]  But religious freedom was a value of this nation

*see, e.g.*, 53 Pa. Cons. Stat. § 8812(a)(1) (exempting "[a]ll churches, meetinghouses or other actual places of regularly stated religious worship" from "all county, city, borough, town, township, road, poor, county institution district and school real estate taxes").

[28] *See* Laycock & Goodrich, 39 Fordham Urb. L.J. at 1032, 1036–37 (explaining that, "[a] new movie theater, grocery store, or Walmart can expect at least some support from residents who expect to patronize it, be employed by it, or gain tax revenue from it," but "the vast majority of residents know they will never attend a proposed new church," and "[c]hurches also face opposition on the closely related ground that they put a damper on commercial or entertainment districts," with the result being that "churches are unwanted in rural and residential districts because they generate too much traffic, and unwanted in commercial districts because they generate too little").

[29] *See* Laycock & Goodrich, 39 Fordham Urb. L.J. at 1021 (explaining that churches "are unpopular in residential zones because they allegedly generate too much traffic, noise, and congestion").

[30] *See Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 525–28 (1993) (describing community-member opposition to religious ritual animal sacrifice practiced in Santeria, leading to ordinances limiting such practices); Laycock & Goodrich, 39 Fordham Urb. L.J. at 1025–36 (explaining the roles of religious hostility and NIMBY ('not in my backyard') resistance in the zoning context); *see also id.* at 1039–40 ("Th[e] widespread resistance to churches results in a collective action problem.  If one suburb is open to churches, and its near neighbors are not, the open suburb may become

from its earliest origins. *See Fulton v. City of Philadelphia*, 593 U.S. 522, 572 (2021) (Alito, J., concurring in the judgment) (explaining that, by the time of the First Amendment's adoption, "the right to religious liberty already had a long, rich, and complex history in this country"). And through RLUIPA's land-use substantial-burden provision, Congress codified a basic principle: except when the implementation of a land use regulation satisfies strict scrutiny, the choice of where the exercise of religion can take place should be left to persons with rights of access to and use of real property – not to zoning codes and landmarking laws promulgated by governments. *See* 42 U.S.C. § 2000cc(a)(1); *see also id.* § 2000cc-5(5) (defining the term 'land use regulation' by reference to a claimant's "ownership, leasehold, easement, servitude, or other property interest in the regulated land").

Thus, in all but the most dire circumstances, a land use regulation that prevents access to or use of real property for religious exercise will contravene RLUIPA – regardless of the presence of feasible alternative locations for the religious exercise.[31] And because a land use regulation must satisfy

---

overloaded. The perception is that too many churches will move in, reducing the tax base and upsetting local residents. Thus, the incentive is for every jurisdiction to exclude at least as much as neighboring jurisdictions, and maybe a little more.").

[31] *Contra Westchester*, 504 F.3d at 352 (considering "whether there are quick, reliable, and financially feasible alternatives" to meeting religious needs as part of the substantial-burden analysis); *Jesus Christ Is the Answer Ministries, Inc. v. Baltimore County*, 915 F.3d 256, 261 (4th Cir. 2019) (explaining that, in circumstances where "an organization acquires property expecting to use it for a religious purpose but is prevented from doing so by the application of a zoning ordinance," there "usually" exists an "impediment to the organization's religious practice [that is] substantial" when

strict scrutiny in order to dictate where religious exercise may take place, Rabbi Hellinger and his congregation did not need to disprove the feasibility of alternative locations for the exercise of their religion in order to show that their exercise of religion was substantially burdened.

Without a likelihood of showing a compelling governmental interest in the enforcement of the 2023 Zoning Ordinance as to the Pierce Street properties, the *prima facie* case is not likely to be rebutted, and it is not necessary to engage in a least-restrictive-means analysis.

Even so, our dissenting colleague identifies another ground on which he believes Rabbi Hellinger and his congregation would not have a likelihood of success on the merits. He opines that the case is unripe because Rabbi Hellinger and Anash sued the Kingston Defendants prematurely. As he sees it, they should not have sued until the Kingston Defendants had

---

"the organization must acquire a different property as a result," provided that "use of the property would serve an unmet religious need" and "the restriction on religious use is absolute rather than conditional"), *as amended* (Feb. 25, 2019); *Livingston Christian Schs.*, 858 F.3d at 1004 (considering the feasibility of alternative locations as part of the substantial-burden analysis); *Edgewood High Sch. of the Sacred Heart, Inc. v. City of Madison*, 95 F.4th 1080, 1088 (7th Cir. 2024) (explaining that "the availability of other adequate properties to host religious activities may defeat a substantial burden claim"); *Marianist Province*, 944 F.3d at 1001 (holding that "requiring a religious institution to use feasible alternative locations for religious exercise does not constitute a substantial burden"); *New Harvest*, 29 F.4th at 602 (explaining that the availability of alternative locations is "plainly relevant to the substantial-burden inquiry"); *Midrash*, 366 F.3d at 1227 n.11 (holding that the absence of feasible alternative locations "does not create a substantial burden within the meaning of RLUIPA").

42

an opportunity to make final determinations as to the application of the 2023 Zoning Ordinance to the Pierce Street properties. Dissent Op. at 9–11. But the Kingston Defendants did make final determinations with respect to the Pierce Street properties. They issued two condemnation orders, and after concluding that there was no quick or easy way to bring the properties into compliance, they threatened daily fines of $500. More deeply, RLUIPA's substantial-burden provision is not contingent upon the formality of a final land-use determination. Rather, that provision applies whenever a "substantial burden is imposed in the implementation of a land use regulation or system of land use regulations, under which a government makes, or has in place formal or informal procedures or practices that permit the government to make, individualized assessments of the proposed uses for the property involved." 42 U.S.C. § 2000cc(a)(2)(C).

Even upon consideration of prudential ripeness,[32] the substantial-burden claim meets the requirements of (i) fitness for judicial decision and (ii) hardship resulting from the withholding of judicial review. *See Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 670 n.2 (2010) ("In evaluating a claim to determine whether it is ripe for judicial review, we consider both 'the fitness of the issues for judicial decision' and 'the hardship of withholding court consideration.'" (quoting *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003))). The substantial-burden claim is fit for judicial decision because it can be evaluated on

---

[32] *But cf. Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 167 (2014) (relying on *Lexmark, Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014), for the proposition that prudential ripeness is "in some tension" with a federal court's virtually unflagging obligation to hear and decide cases within its jurisdiction, but declining to address "the continuing vitality of the prudential ripeness doctrine . . . because the 'fitness' and 'hardship' factors [were] easily satisfied").

this record.  And withholding review would result in a hardship – the substantial burden on the exercise of religion.[33]

---

[33] Our dissenting colleague also suggests that the appeal has become moot by virtue of the consent decree, which provides for the adoption of curative amendments to the 2023 Zoning Ordinance.  Dissent Op. at 8–9.  But the record does not support a mootness ruling.  No party has moved to supplement the record with evidence that Rabbi Hellinger and his congregation have regained access to the Pierce Street properties.  Nor is the consent decree between the United States and Kingston a certain panacea for the RLUIPA substantial-burden claims at issue here as the suit initiated by the Department of Justice did not include a substantial-burden claim.  And although amendments to the 2023 Zoning Ordinance have recently been adopted by the Kingston Town Council, they have not yet taken effect.  Even then, mootness would not be automatic because "a defendant's voluntary cessation of the complained-of conduct does not moot claims for prospective relief unless that defendant meets the 'heavy' burden of establishing that 'there is no reasonable expectation that the wrong will be repeated,'" *Lutter v. JNESO*, 86 F.4th 111, 130 (3d Cir. 2023) (quoting *United States v. W. T. Grant Co.*, 345 U.S. 629, 633 (1953)), and that "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation," *id.* at 130–31 (quoting *County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979)).  Without those showings necessary to overcome the voluntary-cessation exception to mootness, resort to mootness is inappropriate.  Our dissenting colleague cites an out-of-circuit case for the proposition that voluntary-cessation principles do not apply to consent decrees.  Dissent Op. at 9 (citing *Env't Conservation Org. v. City of Dallas*, 529 F.3d 519, 528 (5th Cir. 2008)).  But *consent* decrees are *voluntarily* entered into by the parties to a case, *see Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 378 (1992) ("A consent decree no doubt embodies an agreement of the parties . . . ."), and this Court has not adopted

In sum, there is a likelihood that Rabbi Hellinger and his congregation will succeed on the merits of their substantial-burden claim. And because they seek the same or less-encompassing preliminary injunctive relief with respect to their other claims – those for violating RLUIPA's equal-terms and exclusions-and-limits provisions as well as for procedural due process – it is unnecessary to evaluate the likelihood of success of those claims.

## 2. *Irreparable Harm*

Rabbi Hellinger and his congregation demonstrated an irreparable harm. They lost access to and use of real property that was used for religious exercise, and as a result, the congregation was no longer intact. When a government deprives a person of access to or use of real property for which that person has a right to access or use, the resulting injury qualifies as irreparable harm. *See Minard Run Oil Co. v. U.S. Forest Serv.*, 670 F.3d 236, 256 (3d Cir. 2011), *as amended* (Mar. 7, 2012) ("[W]here 'interests involving real property are at stake, preliminary injunctive relief can be particularly appropriate because of the unique nature of the property interest.'" (quoting *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009))); *see also RoDa Drilling*, 552 F.3d at 1211 (finding irreparable harm when a party "provided all of the funds to purchase [a] property," but was "denied unfettered ownership of that property," with the result being that the party "cannot participate in the everyday operations of its own interests, and the damages arising from that denial are incalculable").

Separately, the loss of religious freedom is itself an irreparable harm. *See Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (per curium) ("The loss of First Amendment freedoms, for even minimal periods of time,

a rule excluding a consent decree entered in separate litigation from scrutiny under voluntary-cessation principles.

45

unquestionably constitutes irreparable injury." (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion))). Thus, here, where the implementation of the 2023 Zoning Ordinance burdens religious instruction, communal prayer, religious group living as well as the use of real property, Rabbi Hellinger and his congregation have established an irreparable harm.

### 3. Balancing the Hardships

The third preliminary-injunction consideration involves comparing the hardship a plaintiff would experience without the injunction to the hardship that a defendant would experience from compliance with the injunction. *See ADP, LLC v. Rafferty*, 923 F.3d 113, 120 (3d Cir. 2019) (explaining that the third consideration requires balancing "the relative hardship that the grant or denial of an injunction would inflict on the parties"); 11A *Wright & Miller's Federal Practice & Procedure* § 2948.2 (3d ed. Apr. 2026) (same). As far as the hardship on Rabbi Hellinger and his congregation, without a preliminary injunction, they cannot use the Pierce Street properties for religious exercise, and Rabbi Hellinger's ability to maintain the fullness of his congregation is inhibited. If the Kingston Defendants were enjoined from condemning the Pierce Street properties, they would not be able to further their interests in land use planning and regulation through the enforcement of the 2023 Zoning Ordinance with respect to those properties. But as explained above, that interest, at least in this case, is not compelling – and it likely does not rise to the level of an important governmental interest.[34] Thus, withholding injunctive relief would inflict a greater hardship on Rabbi Hellinger and his congregation, who seek to practice their religion through the use of the properties, than granting injunctive relief would impose on the Kingston Defendants.

---

[34] *Cf. Whitton*, 54 F.3d at 1408; *Thai Meditation Ass'n*, 83 F.4th at 929–31.

### 4. The Public Interest

When, as here, the relevant public interests are protected by federal law as well as state or municipal law, the supremacy of federal law guides the public-interest analysis. *See generally* U.S. Const. art. VI, cl. 2 (Supremacy Clause). Accordingly, the public interest is greatest in correcting unconstitutional practices, next in addressing interests memorialized in federal law, and then in remedying affronts to state laws and municipal codes.[35] Instead of recognizing that interests protected by federal legislation take precedence over conflicting interests preserved in state or municipal law, the District Court evaluated the public interest solely from the municipal perspective. *Anash*, 2024 WL 5294369, at *11–12. That was error. The public interest favors vindicating RLUIPA's protections for Rabbi Hellinger and his congregation's exercise of religion over the enforcement of the 2023 Zoning Ordinance. *Cf. Ramirez v. Collier*, 595 U.S. 411, 427, 433 (2022) (explaining that, in enacting RLUIPA, Congress

---

[35] *See Kim*, 99 F.4th at 160 ("[R]emedying an unconstitutional practice is always in the public interest."); *KalshiEX, LLC v. Flaherty*, 172 F.4th 220, 232 (3d Cir. 2026) ("If the Act preempts New Jersey law, then the public interest is best served by enforcing the Act."); *see also Roman Cath. Diocese of Brooklyn*, 592 U.S. at 19–20 (recognizing the strong public interest in protecting the First Amendment's guarantee of religious liberty to assemble together for worship in the midst of a public health crisis); *Winter*, 555 U.S. at 25–26 (explaining that the "public interest in conducting [naval] training exercises with active sonar under realistic conditions plainly outweighs the interests advanced by the plaintiffs" in various "ecological, scientific, and recreational interests" from observing and studying wildlife); *Virginian Ry. Co. v. Sys. Fed'n No. 40*, 300 U.S. 515, 552 (1937) ("The fact that Congress has indicated its purpose . . . is in itself a declaration of public interest and policy which should be persuasive in inducing courts to give relief.").

47

evidenced its view that there exists a strong interest in protecting the First Amendment right to the free exercise of religion).

### 5. *The Discretionary Assessment*

Although a preliminary injunction is not awarded as of right, when all four factors favor granting the requested injunction, it is quite likely that denying injunctive relief will be an abuse of discretion. *See Council of Alt. Pol. Parties v. Hooks*, 121 F.3d 876, 884 (3d Cir. 1997). In that situation, the focus shifts away from the eligibility for injunctive relief to instead its appropriate scope. *See id.* (defining the scope of a preliminary injunction when all four factors have been met). And here, the relevant requests for preliminary injunctive relief – to prevent the perpetuation of the access and use restrictions based on noncompliance with the 2023 Zoning Ordinance and to enjoin daily $500 citations for violations of that ordinance – align with the four-factor analysis. The District Court, therefore, abused its discretion in denying those forms of relief.

As far as remedy, there are two means for an appellate court to correct an erroneously denied preliminary injunction. The first is an order reversing the denial and remanding with instructions to grant the injunction. *See* 28 U.S.C. § 2106 ("The Supreme Court or any other court of appellate jurisdiction may . . . remand the cause and direct the entry of such appropriate judgment, decree, or order, or require such further proceedings to be had as may be just under the circumstances."); *see, e.g.*, *FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 353–54 (3d Cir. 2016) (reversing the denial of a motion for a preliminary injunction and remanding with directions to the district court to enter a preliminary injunction); *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 732 (3d Cir. 2004) (same). That approach has the virtues that it does not require an appellate court to set the amount of

48

security needed for the preliminary injunction[36] and it does not deprive a district court of the ability to modify or dissolve the preliminary injunction if justified by a change in circumstances.[37]  The second approach is a reversal on terms imposed by the appellate court.  *See* 28 U.S.C. § 2106 ("The Supreme Court or any other court of appellate jurisdiction may affirm, modify, vacate, set aside or reverse any judgment, decree, or order of a court lawfully brought before it for review . . . .").  That approach, while permissible, is rarely, if ever, used by this Court.

Between those two options, the appropriate remedy in this case is a close call.  The need for fact-finding by the District Court as to the amount of security is not great because this Court, like other appellate courts,[38] recognizes a narrow

---

[36] *See* Fed. R. Civ. P. 65(c) ("The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."); *see also Hope*, 972 F.3d at 322 ("Under Rule 65(c), the absence of a bond precludes issuance of an injunction."); *Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp.*, 847 F.2d 100, 103 (3d Cir. 1988) ("While there are exceptions, the instances in which a bond may not be required are so rare that the requirement is almost mandatory.").

[37] *Cf.* 11A *Wright & Miller's Federal Practice & Procedure* § 2947 ("A preliminary injunction remains in effect until a final judgment is rendered or the complaint is dismissed, unless it expires earlier by its own terms, or is modified, stayed, or reversed.").

[38] *See Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 803 n.8 (3d Cir. 1989) ("Other courts of appeal have held that certain non-commercial and public interest cases may require dispensing with the bond" (citations omitted)); *see also*

exception to the bond requirement based on consideration of the equities and the potential hardships to the parties resulting from waiving that requirement.[39] From the record, this case likely qualifies for the exception because the balance of the hardships, both financial and otherwise, tilts heavily in favor of Rabbi Hellinger and there is no monetary or undue hardship on the Kingston Defendants for compliance with the preliminary injunction. But while a preliminary injunction that is strictly prohibitory may be less susceptible to modification or dissolution by changed circumstances, this situation is potentially dynamic. After oral argument in this case, the United States Department of Justice separately sued Kingston for RLUIPA violations, and in response, Kingston entered a consent decree wherein it agreed to amend its 2023 Zoning Ordinance. In light of the potential overlap between that decree and the injunction in this case, it makes sense for the District Court to have the ability to modify or dissolve the injunction in this case if justified by changed circumstances.

*Temple Univ. v. White*, 941 F.2d 201, 219 n.26 (3d Cir. 1991) (collecting cases).

[39] *See Temple Univ.*, 941 F.2d at 219–20 (deciding that, as the moving party "was on the brink of financial ruin" while "virtually no risk existed" for the opposing party in complying with the ordered relief, "[t]he equities of potential hardships to the parties, therefore, weighed in favor of waiving the bond requirement"); *see also Elliott*, 98 F.3d at 59–60 (explaining that this Court has a "recognized an exception to the Rule 65(c) bond requirement," albeit a "narrow" one, in circumstances where "specific findings" demonstrate that "the balance of these equities weighs overwhelmingly in favor of the party seeking the injunction"); *Zambelli Fireworks Mfg. Co. v. Wood*, 592 F.3d 412, 426 (3d Cir. 2010) (determining that "discretion under Rule 65(c) to waive a bond requirement" exists "in the exceptionally narrow circumstance where the nature of the action necessarily precludes any monetary harm to the defendant").

Thus, the appropriate remedy here is a reversal of the order denying the motion for preliminary injunction and a remand with instructions for the District Court to set security in an amount not to exceed $500 and to enter, on an expedited basis,[40] an order that preliminarily enjoins the Kingston Defendants from (i) restricting access to and use of the Pierce Street properties based on those properties' actual or alleged non-compliance with the 2023 Zoning Ordinance and (ii) issuing daily $500 citations based on the Pierce Street properties' actual or alleged violations of 2023 Zoning Ordinance.

## CONCLUSION

For the above reasons, we will REVERSE the order of the District Court denying the motion for preliminary injunctive relief and REMAND for further proceedings consistent with this Opinion.

---

[40] *See Kos Pharms.*, 369 F.3d at 732 (reversing and remanding an order denying a preliminary injunction with instructions for entry of a preliminary injunction on an expedited basis).

RESTREPO, *Circuit Judge*, dissenting.

The majority's opinion contravenes a cohesive body of law among our sister circuits interpreting the substantial burden provision of the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc(a)(1).[1] Commentators have described the courts as "coalesce[ing] around a totality-of-the-circumstances test, examining whether the government's actions substantially inhibit religious exercise, rather than merely inconveniencing it." John Kenneth Felter, A.B.A. Lit. Sec., *Federal Claims Based on Land Use Regulation*, 13 Bus. & Com. Litig. Fed. Cts. § 149:44 (5th ed. 2025) (citation modified). But the majority does not engage with this caselaw and merely offers in a footnote the vague statement that "[o]ur sister circuits have taken a variety of approaches," followed by a string cite. Maj. Op. 25 n.17.

Instead, the majority relies on RLUIPA's separate provisions governing prison inmates despite recognizing that the substantial burden analysis in the prison context is "not applicable" to RLUIPA land use cases. Maj. Op. 26 (quoting *Washington v. Klem*, 497 F.3d 272, 277 (3d Cir. 2007)). RLUIPA land use decisions uniformly caution against relying on principles from prison cases because "land-use regulations do not typically compel plaintiffs to 'violate their beliefs' in the way that, for example, prison rules might require an inmate to engage in conduct that goes against his or her religious tenets." Livingston Christian Schs. v. Genoa Charter Twp., 858 F.3d

---

[1] Only the Fifth and Tenth Circuits have not precedentially analyzed a land use regulation under RLUIPA's substantial burden provision. *Cf. Grace United Methodist Church v. City of Cheyenne*, 451 F.3d 643, 660–63 (10th Cir. 2006) (considering only whether the substantial burden provision encompasses non-fundamental religious activities).

1

996, 1003–04 (6th Cir. 2017); see also Marianist Province of United States v. City of Kirkwood, 944 F.3d 996, 1001 (8th Cir. 2019) (stating the court was "not swayed" by caselaw from the prison context because land use plaintiff was "not being forced to violate its religious beliefs"); Bethel World Outreach Ministries v. Montgomery Cty. Council, 706 F.3d 548, 555 (4th Cir. 2013) (rejecting application of substantial burden standard in prison cases because "the Government lacks comparable control in the land use context").

The majority goes further afield, announcing its own "specific legal rules" for RLUIPA land use cases. Maj. Op. 31. The majority's "legal rules" are anything but "specific," as evidenced by the majority's sweeping conclusion that "in all but the most dire circumstances, a land use regulation that prevents access to or use of real property for religious exercise will contravene RLUIPA." Maj Op. 41. This approach not only flouts the fact-intensive approach employed by eight circuits but disregards our obligation to "tak[e] seriously the requirement that a burden be 'substantial'" in order to "avoid an interpretation of RLUIPA that would exempt religious institutions from all land-use regulations." Livingston Christian Schs., 858 F.3d at 1003; see also Roman Cath. Bishop of Springfield v. City of Springfield, 724 F.3d 78, 96 (1st Cir. 2013) (recognizing that "RLUIPA does not mean that any land use restriction on a religious organization imposes a substantial burden—such a conclusion would stretch First Amendment jurisprudence too far").

The circuits have warned against a framework like the majority's that "effectively would be granting an automatic exemption to religious organizations" and thus "usurp the role of local governments" and improperly "favor religious uses over secular uses." Andon, LLC v. City of Newport News, 813 F.3d 510, 516 (4th Cir. 2016); see also Petra Presbyterian Church v. Vill. of Northbrook, 489 F.3d 846, 851 (7th Cir. 2007) (cautioning that "the requirement of substantial burden is taken seriously" to avoid impermissibly "free[ing] religious

2

organizations from zoning restrictions of any kind"). The majority's approach also contravenes RLUIPA's intent as indicated by its plain language. As the Fourth Circuit has explained: "By requiring that any substantial burden be imposed by governmental action and by carefully balancing individual rights and compelling governmental interests, the language of RLUIPA demonstrates that Congress did not intend for RLUIPA to undermine the legitimate role of local governments in enacting and implementing land use regulations." Andon, 813 F.3d at 516.

Unlike the majority, I would follow the approach and guidance of our sister circuits. The circuits consider two factors that are particularly apposite here: (1) whether the plaintiff had a reasonable expectation of religious land use or whether the plaintiff's burden was self-imposed; and (2) whether the plaintiff had ready alternatives.

Under the first factor, it is relevant that Appellants knew the properties were restricted in usage because "if a religious institution acquires land knowing that it is subject to certain restrictions, any burden resulting from those restrictions has not been imposed by the government; but rather, the burden is self-imposed."[2] Alive Church of the Nazarene, Inc. v. Prince

---

[2] Contrary to the majority's assertion, consideration of a plaintiff's conduct derives from RLUIPA's limits, only protecting against burdens that are substantial and result from a "government . . . impos[ing] or implement[ing] a land use regulation." 42 U.S.C. § 2000cc(a)(1). To disregard a plaintiff's conduct would allow a plaintiff to "state a RLUIPA substantial burden claim simply by alleging that it received an adverse land use ruling." *Bethel World*, 706 F.3d at 557 n.4. Nor do I contend, as the majority charges, that RLUIPA has a "sincerity-of-belief prerequisite." Maj Op. 32 n.21. The inquiry is not whether the plaintiff's religious beliefs were reasonable

3

William Cnty., 59 F.4th 92, 106 (4th Cir. 2023); see also Chabad Lubavitch of Litchfield Cnty., Inc. v. Litchfield Historic Dist. Comm'n, 768 F.3d 183, 196 (2d Cir. 2014) (instructing district court to consider "whether the Chabad reasonably believed it would be permitted to undertake its proposed modifications when it purchased the property"); Livingston Christian Schs., 858 F.3d at 1004 (recognizing that when the plaintiff "obtained an interest in land without a reasonable expectation of being able to use that land for religious purposes," it suffered no substantial burden when land use regulations were enforced); Petra Presbyterian Church, 489 F.3d at 851 (rejecting substantial burden claim when plaintiff obtained property in industrial zone to use as a place of worship despite knowing places of worship were prohibited).

Upon purchase of the properties, Appellant Shimon Hellinger knew that he could use the 44 Pierce property only as an office space and the 239 Pierce property only as a single-family home. Any changes to these uses without approval from Appellee Borough of Kingston (the "Borough") would "automatically render" the certificates of occupancy for the properties "null and void." App. 217–18. Appellants, without approval, began using 44 Pierce as a yeshiva and gathering place for their congregation to pray and study together. They used 239 Pierce to house the yeshiva attendees, housing as many as ten or eleven students at one time with children as young as thirteen living at the property. The Borough did not "alter[] a legitimate, pre-existing expectation that a property could be obtained for a particular land use," and, therefore, Appellants' hardships are self-imposed burdens. Andon, 813 F.3d at 515.

---

or sincere, but whether the plaintiff reasonably expected to use the property for religious purposes.

4

This first factor also considers the plaintiff's "own actions," Livingston Christian Schs., 858 F.3d at 1004, including any "unwillingness to modify its proposal in order to comply with applicable zoning requirements," Thai Meditation Ass'n of Alabama, Inc. v. City of Mobile, 980 F.3d 821, 832 (11th Cir. 2020). See also St. Paul's Found. v. Ives, 29 F.4th 32, 42–43 (1st Cir. 2022) (denying substantial burden claim where plaintiff sought new use for property and was "unwilling to confirm that the use designation . . . underlying the original permit still applied"); New Harvest Christian Fellowship v. City of Salinas, 29 F.4th 596, 602 (9th Cir. 2022) (rejecting substantial burden claim where religious group "declined to adopt the City's proposed modification . . . or otherwise reconfigure" the space). Over the course of a year, the Borough sent Hellinger correspondence to schedule property inspections and to explain the deficiencies in the use of the properties and the process for addressing these deficiencies. Hellinger did not respond or take any action to contest the Borough's position. Appellants' dereliction weighs against the substantial burden claim.

On the second factor, the substantial burden analysis considers whether Appellants had alternative means of carrying out their mission. See Marianist Province, 944 F.3d at 1001 ("We agree with other circuits that have concluded requiring a religious institution to use feasible alternative locations for religious exercise does not constitute a substantial burden."); Edgewood High Sch. of the Sacred Heart, Inc. v. City of Madison, 95 F.4th 1080, 1088 (7th Cir. 2024) (reiterating that "the availability of other adequate properties to host religious activities may defeat a substantial burden claim"); Chabad Lubavitch, 768 F.3d at 196 (directing district court to consider "whether feasible alternatives existed for the Chabad to exercise its faith"); Livingston Christian Schs., 858 F.3d at 1004 (identifying as a "helpful factor[]" whether the plaintiff had a "feasible alternative location"); New Harvest, 29 F.4th at 604 (concluding that plaintiff's access to other locations "militate[s] against a finding of substantial burden");

5

Midrash Sephardi, Inc. v. Town of Surfside, 366 F.3d 1214, 1228 (11th Cir. 2004) (holding that religious congregations were not substantially burdened where they have "the alternative of applying for a permit to operate only a few blocks from their current location"). Here, importantly, after the Borough deemed their properties unsafe for occupancy, Appellants continued to operate at different locations. Rather than engaging with the above precedent, the majority dismisses the importance of alternative locations based on the unsubstantiated justification that "there are several reasons why governments may not want real property used for religious exercise." Maj. Op. 39.

Applying the proper totality-of-the-circumstances analysis and weighing the factors other circuits consider would lead me to affirm the District Court and hold that Appellants are unlikely to succeed on their RLUIPA substantial burden claim.

***

Separate from the merits, this appeal fails on justiciability grounds.

First, the majority runs afoul of the prohibition against opinions "advising what the law would be upon a hypothetical state of facts." Chafin v. Chafin, 568 U.S. 165, 172 (2013) (quoting Lewis v. Cont'l Bank Corp., 494 U.S. 472, 477 (1990)). In February 2026, the Department of Justice ("DOJ") and the Borough entered into a consent order requiring the Borough to amend the 2023 Zoning Ordinance for the express purpose of complying with RLUIPA. See Consent Order, United States v. Borough of Kingston, No. 26-cv-00269 (M.D. Pa. Feb. 6, 2026), Dkt. No. 4. The Borough approved the zoning amendments on July 7, 2026. These amendments resolve this case's RLUIPA claims by permitting places of worship, religious schools, and religious dormitories as of right in all commercial districts and permitting such uses by special exception in all residential districts. As this appeal solely concerns the denial of injunctive relief, these amendments will

6

moot the appeal. See Lighthouse Inst. for Evangelism, Inc. v. City of Long Branch, 510 F.3d 253, 260 (3d Cir. 2007) (dismissing claims for injunctive relief under RLUIPA where amendment "superseded the Ordinance in all relevant respects," and thus "mooted Lighthouse's claims for injunctive relief").

The majority overlooks mootness under the pretense of voluntary cessation. But our precedent establishes that where zoning regulations are challenged as invalid, amendments removing the challenged features moot claims for injunctive relief; there is no voluntary cessation inquiry in these scenarios. See id.; CMR D.N. Corp. v. City of Philadelphia, 703 F.3d 612, 628 (3d Cir. 2013) (holding that constitutional claim regarding zoning ordinance was mooted by rescission of ordinance's height restriction). Moreover, it is not evident that actions in response to a DOJ consent decree are voluntary. See Env't Conservation Org. v. City of Dallas, 529 F.3d 519, 528 (5th Cir. 2008) ("Far from voluntary, the City's compliance . . . has been compelled by an EPA enforcement action and the resulting court-approved consent decree.").

Additionally, the consent decree and ensuing amendments bring the Borough under the ambit of RLUIPA's safe harbor provision, which enables the government to "avoid the preemptive force" of RLUIPA "by changing the policy or practice that results in a substantial burden on religious exercise" or by "any other means that eliminates the substantial burden." 42 U.S.C. § 2000cc–3(e); see C.L. for Urb. Believers v. City of Chicago, 342 F.3d 752, 762 (7th Cir. 2003) (holding that, under the safe harbor provision, the "amendments to the [zoning ordinance] render RLUIPA's nondiscrimination provision inapplicable").

Second, the preliminary injunction seeks relief for Appellants' as-applied challenges—to reinstate Appellants to their properties. To have a ripe claim in a land use case, zoning authorities must have had "an opportunity to 'arrive[] at a final,

7

definitive position regarding how [they] will apply the regulations at issue to the particular land in question.'" Sameric Corp. of Delaware, Inc. v. City of Philadelphia, 142 F.3d 582, 597 (3d Cir. 1998) (alteration in original) (quoting Taylor Inv., Ltd. v. Upper Darby Twp., 983 F.2d 1285, 1291 (3d Cir. 1993)).

Therefore, we have dismissed as unripe constitutional claims based upon land use decisions because the plaintiffs "did not give the locality an opportunity to make a final determination regarding how to construe the applicable ordinances and apply them to the particular property." Id.; see also Acierno v. Mitchell, 6 F.3d 970, 975–77 (3d Cir. 1993) (holding constitutional claim premature where owner was denied building permit but did not appeal the denial or seek a variance); Taylor, 983 F.2d at 1292–93 (deeming claim unripe where zoning officer revoked use permit and plaintiffs did not reapply, appeal, or seek variance). There is no reason why the same rationale should not apply to land use decisions under RLUIPA and other circuits have reached the same conclusion in analogous RLUIPA cases. See Grace Cmty. Church v. Lenox Twp., 544 F.3d 609, 616 (6th Cir. 2008) (concluding RLUIPA claims were premature where church made no attempts to appeal special use permit revocation, complete the factual record, or engage with zoning authorities); Murphy v. New Milford Zoning Comm'n, 402 F.3d 342, 352 (2d Cir. 2005) (deeming RLUIPA claims unripe because plaintiff failed to seek a variance or appeal zoning commission's violation notice regarding prayer meetings held in plaintiff's residence).

Here, as in the above decisions, Appellants did not engage in the administrative process or take any efforts to appeal the Borough's determinations. Accordingly, we do not know how the Borough would have actually applied the zoning ordinance. Because the record is not sufficiently developed, a court cannot

properly adjudicate the merits of the as-applied claims that are the subject of the preliminary injunction.[3]

For these reasons, I respectfully dissent.

*Counsel for Appellants*
Alexander M. Brunelle     [Argued]

*Counsel for Appellees*
David J. MacMain
Stephen G. Rhoads     [Argued]

---

[3] Although the majority rejects these concerns because the text of RLUIPA does not explicitly identify a ripeness requirement, ripeness is a "prerequisite to all federal actions." *Peachlum v. City of York*, 333 F.3d 429, 433 (3d Cir. 2003) (quoting *Presbytery of N.J. of Orthodox Presbyterian Church v. Florio*, 40 F.3d 1454, 1462 (3d Cir. 1994)). Our Circuit has long upheld the "importance of the finality requirement and our reluctance to allow the courts to become super land-use boards of appeals" in land use cases. *Sameric*, 142 F.3d at 598. The weight of the RLUIPA caselaw says the same. *See Guatay Christian Fellowship v. Cnty. of San Diego*, 670 F.3d 957, 979 (9th Cir. 2011) ("All of the circuits to address this issue have applied the final decision requirement to RLUIPA claims . . . .").